**Chuck Lee MATHENIA, Appellant,**

v.

**Paul DELO, Appellee.**

**No. 91–2042.**

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 8, 1992.

Decided Sept. 11, 1992.

Rehearing and Rehearing En Banc
Denied Nov. 3, 1992.

**446**

Lawrence Fleming, St. Louis, Mo., argued, for appellant.

Stephen D. Hawke, Jefferson City, Mo., argued, for appellee.

Before BEAM, Circuit Judge, BRIGHT, Senior Circuit Judge, and VAN SICKLE,* Senior District Judge.

VAN SICKLE, Senior District Judge.

Charles (Chuck) Lee Mathenia, a Missouri death row inmate, appeals from the judgment of the district court[1] denying his petition for writ of habeas corpus. Mathenia argues that the district court erred in

denying his claims of ineffective assistance of counsel, and in denying his claims that his Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated. We affirm.

## I. BACKGROUND

The evidence adduced during trial showed that in the early morning hours of April 24, 1984, near Fredericktown, Missouri, Mathenia murdered Daisy Nash and Louanna Bailey. As stated in the opinion of the Missouri Supreme Court:

Decedents were Daisy Nash, 72, and her mentally impaired sister Louanna Bailey, aged 70. Appellant had lived with Daisy Nash for some seven years prior to her death. At the time of the killings, appellant was 25 years old and still living with Nash.

In September of 1983 appellant allegedly twice raped Louanna Bailey and in December of that year he was charged for those offenses upon her complaint. However, in February Louanna Bailey dropped the charges, indicating she would refuse to testify against appellant. The evidence indicated that the murders were motivated by appellant's resentment at having been arrested and confined in connection with these charges. Appellant vowed to take revenge on the two sisters.

Sometime after midnight on April 24, 1984, appellant returned home after spending the day with his sister and brother-in-law. An argument began with Daisy Nash as soon as he entered the house. During the course of this argument, appellant hit the 72–year–old woman in the face, knocking her to the floor. He then retrieved a butcher knife from the kitchen and after kicking and beating her savagely, he stabbed her several times.

Shortly thereafter, appellant rode his bicycle the two blocks to Louanna Bailey's home and told her he had killed

* The HONORABLE BRUCE M. VAN SICKLE, Senior United States District Judge for the District of North Dakota, sitting by designation.

1. The HONORABLE JOHN F. NANGLE, Senior District Judge for the Eastern District of Missouri.

Daisy. While Louanna tried to call Daisy, appellant procured a butcher knife. When he returned, Louanna attempted in vain to flee. Appellant stabbed her fatally in the back.

*State v. Mathenia,* 702 S.W.2d 840, 841 (Mo. banc 1986).

Following a change of venue, Mathenia was convicted in Jefferson County Circuit Court of two counts of capital murder and was sentenced to death by lethal gas. Mathenia was represented at trial by public defender Donald Hager. Mathenia's convictions and sentences of death were affirmed on direct appeal. *State v. Mathenia,* 702 S.W.2d 840 (Mo. banc.), *cert. denied,* 477 U.S. 909, 106 S.Ct. 3286, 91 L.Ed.2d 574 (1986). Mathenia then sought state post-conviction relief pursuant to Missouri Supreme Court Rule 27.26 (repealed 1988). The circuit court denied relief and the Missouri Court of Appeals affirmed. *Mathenia v. State,* 752 S.W.2d 873 (Mo. App.1988), *cert. denied,* 488 U.S. 1019, 109 S.Ct. 819, 102 L.Ed.2d 809 (1989). Mathenia then filed a petition for writ of habeas corpus in the United States District Court for the Eastern District of Missouri pursuant to 28 U.S.C. § 2254. Following a limited evidentiary hearing, the district court denied the petition. *Mathenia v. Delo,* No. 89–88C(1) (E.D.Mo. April 22, 1991).

## II. DISCUSSION

### A. *Ineffective Assistance of Counsel*

Mathenia claims that he was denied his Sixth and Fourteenth Amendment right to effective assistance of counsel. On appellate review, "the issue of effective assistance of counsel presents a mixed question of law and fact." *Schlup v. Armontrout,* 941 F.2d 631, 637 (8th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1273, 117 L.Ed.2d 499 (1992). Thus, the court reviews the district court's legal conclusions de novo, while findings of fact are reviewed under the clearly erroneous standard. *Couch v. Trickey,* 892 F.2d 1338, 1341 (8th Cir.1989).

To prevail on his claims of ineffective assistance, Mathenia must establish that (1) counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). *See also Sanders v. Trickey,* 875 F.2d 205, 207–208 (8th Cir.), *cert. denied,* 493 U.S. 898, 110 S.Ct. 252, 107 L.Ed.2d 201 (1989).

■ The first claim of ineffective assistance is the failure of defense counsel to investigate and file a motion to suppress a confession given by Mathenia. The factual context surrounding the confession was stated by the Missouri Court of Appeals:

Defendant was arrested on April 25, 1984, and given Miranda warnings. He made no statement at that time. On Saturday, May 5, 1984, he advised a deputy sheriff he wished to talk to him. Because a lawyer had been appointed to represent defendant, the sheriff refused to permit him to make a statement at that time. On Monday, May 7, defendant spoke with his attorney by telephone, then told the sheriff his lawyer had advised him not to make a statement but he wanted to do so anyway. Only then did the sheriff take the video-taped confession.

*Mathenia v. State,* 752 S.W.2d at 875.

On May 7, 1984, Mathenia confessed to the murders of Nash and Bailey. During the forty minute video-taped confession, Mathenia described in detail the events of April 24 and April 25, 1984. The video-taped confession was admitted at trial and was shown to the jury. Trial Tr. 276. Mathenia claims that defense counsel was ineffective for failing to investigate and file a motion to suppress the confession.

At the evidentiary hearing before the district court, Donald Hager testified in regard to his failure to file a motion to suppress the confession.

Q. Why did you not pursue or file such motion?

A. I felt that it had no chance of success, based on my assessment of this case, the facts of this case, and several years of experience in prosecuting and defending. And experience with state trial judges.

Hearing Tr. 171. Supposedly, the motion to suppress would have been supported by the claim that Mathenia's confession was not knowingly and intelligently made. Mathenia is mildly mentally retarded with an intelligence quotient of approximately 70. Mathenia asserts that because of his mental retardation he could not have knowingly and intelligently waived his *Miranda* rights. However, Mathenia's decision to confess was uncoerced, his lawyer had advised him to stand mute, and he was aware of the state's intention to use his statement against him. Our review of the video-taped confession convinces us that the circumstances surrounding the confession establish that Mathenia possessed "the requisite level of comprehension" to waive his *Miranda* rights. *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). We agree with the district court that defense counsel's failure to file a motion to suppress was not deficient performance.

■ Further, while Mathenia's graphic confession was destructive to his defense, it was far from the only evidence against him. Joyce St. Clair, Mathenia's step-sister, testified at the trial that Mathenia told her he had committed the murders. Trial Tr. 243–244. Robert Massey and Ronald Reed, inmates at the Jefferson County jail, each testified that Mathenia told them that he had killed two people. Trial Tr. 250, 255. The district court was correct in finding that the defense was not prejudiced since the outcome would not have been different had the confession been suppressed.

■ Mathenia next contends that defense counsel was ineffective for failing to present a diminished capacity defense. Mathenia claims his entitlement to this defense on two grounds: (1) mental retardation and (2) voluntary intoxication. In order to present a diminished capacity defense, Mathenia would have to show that at the time of the murders, he did not appreciate the nature of his conduct or was incapable of conforming his conduct as a result of mental disease or defect. Mo.Rev.Stat. §§ 562.086.1 and 552.010. The mental ex-

aminations performed by Dr. Basset and Dr. Vicioso did not reveal a mental disease or defect. Mental retardation in itself is insufficient to support a diminished capacity defense. *State v. Gilmore,* 681 S.W.2d 934, 940 (Mo. banc 1984).

■ A person who is voluntarily intoxicated is criminally responsible for his conduct unless such condition "[n]egatives the existence of the mental states of purpose or knowledge." Mo.Rev.Stat. § 562.076.-1(1). As the district court found, there is no evidence that Mathenia's intoxication, if any, was so extreme as to negate purpose or knowledge. *Morris v. State,* 763 S.W.2d 327, 329–330 (Mo.App.1988).

■ Mathenia next contends that defense counsel was ineffective for failing to present certain mitigating witnesses. Mathenia presented three witnesses at the penalty phase of the trial. Thomas Davis, Mathenia's brother, testified as to Mathenia's childhood. Dr. Gary Bassett, a psychiatrist at the Farmington State Hospital, testified that Mathenia is mildly mentally retarded. Finally, Nina Hamilton, Mathenia's grade school teacher, testified as to her observations of Mathenia at that time. Still, Mathenia maintains that defense counsel should have presented the additional testimony of Reverend Gary Brinkley, Dorothy Stevens and Harold Mathenia. The district court concluded that these additional mitigation witnesses would have been cumulative and that defense counsel's performance in failing to present this testimony was not deficient. We agree.

B. *Statutory Aggravating Circumstances*

■ At the penalty phase, the trial court instructed the jury on statutory aggravating circumstances. The court instructed the jury that it must find unanimously and beyond a reasonable doubt at least one of the following: that "the murder of [Nash and Bailey] was outrageously or wantonly vile, horrible or inhuman in that it involved torture or depravity of mind" and that "the murder of [Nash and Bailey] was committed by the defendant for the purpose of preventing [Nash and Bailey] from testify-

ing in a judicial proceeding." Mo.Rev.Stat. § 565.012.2(7) & (12). The jury found only the first statutory aggravating circumstance as to Nash's murder, while finding both statutory aggravating circumstances as to Bailey's murder.

Mathenia, relying on *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) and *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (plurality opinion), contends that the statutory aggravating circumstance of "outrageously or wantonly vile, horrible or inhuman in that it involved torture or depravity of mind" as applied, is so vague as to violate the Eighth Amendment. *See also Stringer v. Black,* —— U.S. ——, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992) (petitioner not foreclosed from relying on *Maynard* even though his death sentence became final before that case).

If Missouri wishes to authorize capital punishment "it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey,* 446 U.S. at 428, 100 S.Ct. at 1764. *See also Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality opinion); *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (per curiam). The aggravating circumstance at issue risks the arbitrary and capricious infliction of the death penalty because, "[a]ll murder, after all, is horrible, vile, inhuman, and so forth." *Smith v. Armontrout,* 888 F.2d 530, 538 (8th Cir. 1989). Consequently, sentencing pursuant to such an aggravating circumstance provides no means to distinguish those that receive the death penalty from those who do not. In order to meet its Eighth Amendment obligations, Missouri must "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance' and that 'make rationally reviewable the process for imposing a sentence of death.'" *Godfrey,* 446 U.S. at 428, 100 S.Ct. at 1764–1765.

The Missouri Supreme Court responded to *Godfrey* as follows:

this Court, while not expressly adopting a precise definition, has noted the following factors to be considered in finding "depravity of mind": mental state of defendant, infliction of physical or psychological torture upon the victim as when victim has a substantial period of time before death to anticipate and reflect upon it; brutality of defendant's conduct; mutilation of the body after death; absence of any substantive motive; absence of defendant's remorse and the nature of the crime.

*State v. Preston,* 673 S.W.2d 1, 11 (Mo. banc). *cert. denied,* 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984). *See also State v. Smith,* 756 S.W.2d 493 (Mo. banc 1988), *cert. denied,* 488 U.S. 1019, 109 S.Ct. 823, 102 L.Ed.2d 812 (1989).

■ Here, the court simply instructed the jury to determine "[w]hether the murder of [Nash and Bailey] was outrageously or wantonly vile, horrible or inhuman in that it involved torture or depravity of mind." The jury was equally terse, declaring that they had found the subject aggravating circumstance as follows: "outrageously, wantonly vile, horrible, inhuman, involved torture, depravity of mind." Thus, the question is whether the Missouri Supreme Court cured "the unfettered discretion of the jury" on direct appeal. *Maynard,* 486 U.S. at 364, 108 S.Ct. at 1859. We inquire further, "because a state supreme court may salvage a facially-vague statute by construing it to provide the sentencing body with objective criteria for applying the statute." *Moore v. Clarke,* 904 F.2d 1226, 1229 (8th Cir.1990), *reh'g denied,* 951 F.2d 895 (8th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1995, 118 L.Ed.2d 591 (1992). *See also Mercer v. Armontrout,* 643 F.Supp. 1021, 1024 (W.D.Mo.1986) ("the absence of legislative or court-imposed standards to govern the jury in weighing aggravating circumstances does not render the sentencing statute invalid if applied in a constitutional fashion"), *aff'd,* 844 F.2d 582 (8th Cir.), *cert. denied,* 488 U.S. 900, 109 S.Ct. 249, 102 L.Ed.2d 238 (1988).

■ On the facts of this case, the Missouri Supreme Court held:

> There is no doubt that appellant's savage beating of Daisy Nash supported a finding of the first circumstance as did appellant's "infliction of * * * psychological torture upon [Louanna Bailey] * * * when [she had] a substantial period of time before death to anticipate and reflect on it."

*State v. Mathenia*, 702 S.W.2d at 845 (quoting *Preston*). The evidence supported the finding that Mathenia inflicted physical torture on Nash. Dr. Michael Graham, a pathologist, testified at trial that there was "extensive fractures of the bones of the face, the bones of the cheek, the nose and the base of the skull.... And the left jaw was also fractured." Trial Tr. 154. The evidence also supported the finding that Mathenia inflicted psychological torture on Bailey. After killing Nash, Mathenia went to the home of Bailey. Mathenia informed Bailey that he had just killed Nash. Mathenia then procured a knife from Bailey's kitchen and stabbed Bailey in the back as she attempted to flee. A finding of torture, whether physical or psychological, is a proper limiting construction. *Smith v. Armontrout*, 888 F.2d 530, 537–539 (8th Cir.1989). *See also Harper v. Grammer*, 895 F.2d 473 (8th Cir.1990). We agree with the district court that the construction applied by the Missouri Supreme Court sufficiently narrowed the class of persons eligible for the death penalty. *See Newlon v. Armontrout*, 885 F.2d 1328, 1335 (8th Cir.1989), *cert. denied*, — U.S. ——, 110 S.Ct. 3301, 111 L.Ed.2d 810 (1990).[2]

■ The second statutory aggravating circumstance found was that "the murder of Louanna Bailey was committed by the defendant for the purpose of preventing Louanna Bailey from testifying in a judicial proceeding." Mo.Rev.Stat. § 565.012.2(12). The jury found this aggravating circumstance only with respect to Bailey's murder. Mathenia contends that this statutory

aggravating circumstance was unconstitutionally vague, unsupported by the evidence, and an ex post facto application.

On direct appeal, the Missouri Supreme Court stated:

> ... there was sufficient evidence that both Daisy Nash and Louanna Bailey were potential witnesses against appellant for the alleged rapes of Louanna Bailey. The evidence also supported a finding that Louanna Bailey was a potential witness against the appellant in the murder of Daisy Nash.

*State v. Mathenia*, 702 S.W.2d at 845. In September 1983, it was alleged that Mathenia twice raped Bailey. However, in February 1984, Bailey dropped the charges. Mathenia argues that at the time of the murder, Bailey could not have been a witness against him since the rape charges had been dropped. Of course, at the time of her murder, Bailey was not a witness against Mathenia for the Nash murder either.

Mathenia seems to maintain that there must be a pending judicial proceeding and that the murder must be for the purpose of preventing testimony at that proceeding. In contrast, the Missouri Supreme Court spoke of Bailey as a "potential" witness. Mathenia, with blood-stained pants, told Bailey he killed Nash. At that point, Bailey was certainly a potential witness against Mathenia. Mathenia then argues that since the statute was subsequently amended to include the language "potential witness", the amended statute was retroactively applied to him. Mathenia offers no authority for his argument that Bailey's status as a potential witness in regard to the Nash murder was not encompassed by the statute as it then existed. The district court properly rejected this claim.

### C. Non-Statutory Circumstances

■ The jury was instructed on non-statutory aggravating circumstances as follows:

---

**2.** Mathenia also asserts that defense counsel was ineffective for failing to object to the submission of this statutory aggravating circumstance. We agree with the district court that since the

aggravating circumstance was properly submitted, defense counsel's failure to object was not deficient performance.

You may also consider any of the following circumstances if you find from the evidence beyond a reasonable doubt that it exists and that it is an aggravating circumstance:

■ That within approximately six hours [after, prior] the murder of [Nash, Bailey] defendant committed a second murder, the victim being [Bailey, Nash]. The murders were committed at different locations;

■ That [Nash, Bailey] was a potential witness in a past felony criminal proceeding against the defendant on charges in Madison County Circuit Court, case number CR283–343FX, and [Nash, Bailey] was killed as a result of her involvement as a material witness against the defendant;

■ That defendant on April 24, 1984, was a 25 year old male and [Nash, Bailey] was a [72, 70] year old female.

■ After the murders of Daisy Nash and Louanna Bailey, the defendant committed additional felonies involving the use or threat of violence to other persons while being held in the custody of the Jefferson County Jail.

The jury found all four non-statutory aggravating circumstances as to both murders.

The Missouri Approved Instructions (MAI) provided for instructions on non-statutory aggravating circumstances "if there is evidence supporting an aggravating circumstance or circumstances 'otherwise authorized by law'." MAI Cr.2d 15.42 Note 3. Mathenia claims that none of the non-statutory aggravating circumstances presented to the jury had been "authorized by law".

The district court correctly noted that *Zant v. Stephens,* 462 U.S. 862, 878, 103 S.Ct. 2733, 2743, 77 L.Ed.2d 235 (1983), permits the jury to consider non-statutory aggravating circumstances. Further, the jury was instructed to consider non-statutory aggravating circumstances only after finding one or more statutory aggravating circumstances. The jury was instructed that if they could not find at least one of the statutory aggravating circumstances,

they must fix the punishment at life imprisonment. Accordingly, the district court correctly denied relief on this claim.

■ Mathenia next objects to the mitigating circumstances instructions. The jury was instructed as follows:

If you decide that a sufficient aggravating circumstance or circumstances exist to warrant the imposition of death, [ ] it will then become your duty to determine whether a sufficient mitigating circumstance or circumstances exist which outweigh such aggravating circumstance or circumstances so found to exist. In deciding that question you consider all of the evidence relating to the murder of [Nash, Bailey].

You may consider:

1. Whether the defendant has no significant history of prior criminal activity.

2. Whether the murder of [Nash, Bailey] was committed while the defendant was under the influence of extreme mental or emotional disturbance.

3. Whether the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.

You may also consider that the defendant had a mental disease or defect at the time of the murder of [Nash, Bailey].

The phrase "mental disease or defect," as used in these instructions, means any mental abnormality, regardless of its medical label, origin or source.

You may also consider any circumstance which you find from the evidence in extenuation or mitigation of punishment.

While Mathenia does not object to the listing of statutory mitigating circumstances, he does object to the lack of instruction concerning non-statutory mitigating circumstances. Mathenia argues that while the state was permitted to submit non-statutory aggravating circumstances, he was precluded from submitting non-statutory mitigating circumstances. As noted, the jury was instructed in general language to "consider any circumstance which

you find from the evidence in extenuation or mitigation of punishment."

Mathenia cites to the Missouri Approved Instructions:

> The jury may consider extenuating or mitigating circumstances even though not set out as "statutory" mitigating circumstances in Section 565.012.3 and even though not "authorized by law" within the meaning of that phrase discussed in 4 above. However, no instruction should be given calling the jury's attention to any particular circumstance referred to in general in this paragraph.

MAI Cr.2d 15.44 Note 5. The Missouri Supreme Court has held that while the jury can consider mitigating evidence, a defendant is not entitled to an instruction on "particular circumstances." *State v. Young*, 701 S.W.2d 429, 437 (Mo. banc 1985), *cert. denied*, 476 U.S. 1109, 106 S.Ct. 1959, 90 L.Ed.2d 367 (1986); *State v. Leisure*, 749 S.W.2d 366, 381 (Mo. banc 1988). More recently, the Missouri Supreme Court stated that a trial court "should not list any nonstatutory mitigating circumstances in the instructions, because the inclusion of some might lead the jury to believe that it may not consider others." *State v. Wacaser*, 794 S.W.2d 190, 195 (Mo. banc 1990).

The Supreme Court has required states to carefully limit and channel the sentencer's discretion through aggravating circumstances. However, the opposite is true when it comes to mitigating circumstances. *See Walton v. Arizona*, 497 U.S. 639, ——— – ———, 110 S.Ct. 3047, 3061–3063, 111 L.Ed.2d 511 (1990) (Scalia, J., concurring). The sentencer may not be precluded from considering any relevant mitigating evidence. *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988); *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion).

While a sentencing scheme that prohibits a defendant from obtaining an instruction on a particular, relevant non-statutory mitigating circumstance may be constitutionally infirm, this case does not squarely present that issue. Mathenia did not request an instruction on a non-statutory mitigating circumstance. Therefore, he cannot now complain that he might have been denied a hypothetical instruction.

### D. *Post-arrest Silence*

■ Mathenia contends that the trial court committed error in overruling defense counsel's objections to the sheriff's statement that, upon arrest and after receiving *Miranda* warnings, Mathenia remained silent. Mathenia is correct that his post-arrest silence may not be used for impeachment purposes or as substantive proof. *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). However, that was not the case here.

Mathenia points to the following colloquy at trial between Madison County Sheriff Gary Asher and the prosecutor:

Q. Sheriff, you made the arrest of the defendant on April 25th, '84, out at his sister's house in Madison County, Missouri?

A. Yes, sir.

Q. And after you arrested him did you advise him of his rights?

A. Yes, sir.

Q. And did he make a statement to you at the time of the arrest?

A. No, sir.

Trial Tr. 270.

On appeal, the Missouri Supreme Court determined that the reference to Mathenia's post-arrest silence was not used to impeach Mathenia or as affirmative proof. Rather, the Missouri Supreme Court found that the colloquy was "merely preliminary to the admission into evidence of [Mathenia's] video-taped statement." *State v. Mathenia*, 702 S.W.2d at 842. The district court agreed with the Missouri Supreme Court's reasoning and found that Mathenia was not entitled to relief on this claim. Shortly after the above colloquy, the jury was shown the video-taped confession. Given these circumstances, we agree with the district court's denial of relief on this claim. Mathenia also argues that the prosecutor made reference to the above testimony in his closing remarks. The district

court concluded that the claim was procedurally defaulted. Regardless, Mathenia is not entitled to relief on this claim. *See Horne v. Trickey,* 895 F.2d 497, 500 (8th Cir.1990).

### E. *Jury Selection*

■ Mathenia makes two claims concerning the voir dire process. First, during voir dire, a venireman stated that he would automatically vote for the death penalty following a capital murder conviction. Mathenia's challenge for cause was denied. Later, none responded then the prosecutor asked the panel if there were any who would not follow the trial court's instructions on aggravating and mitigating circumstances at the penalty phase. Mathenia then removed the venireman with a peremptory strike. The district court, invoking the presumption of correctness expressed in 28 U.S.C. § 2254(d), found fair support in the record for the trial court's conclusion that the venireman would follow the court's instructions. We agree. *See Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

■ Mathenia next contends that the trial court erred in sustaining the state's challenges for cause to two veniremen who indicated that they could not impose the death penalty. The district court, citing *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), denied relief. The district court again found support in the record for the trial court's decision to strike the two veniremen for cause. We agree.

### F. *Mental Culpability*

■ Mathenia asserts that his mental retardation prevented him from having the degree of culpability necessary to justify capital punishment. The district court found that since Mathenia failed to raise this claim in the state courts, the claim was procedurally defaulted. The district court further found that Mathenia had shown neither cause for, nor prejudice from, his default. The district court then noted that the record did not provide grounds for relief on the merits. Again, we agree. *See*

*Penry v. Lynaugh,* 492 U.S. 302, 341, 109 S.Ct. 2934, 2958, 106 L.Ed.2d 256 (1989) (Eighth Amendment does not preclude execution of the mentally retarded).

■ We note also that the evidence demonstrated Mathenia's premeditation. Mathenia's step-sister, Joyce St. Clair, testified as to Mathenia's statement that he "ought to kill Louanna" for having him locked up on the rape charges. Ms. St. Clair also testified that shortly before the murders, Mathenia asked her how much time his father had received for a murder. Ms. St. Clair told Mathenia that his father had received thirty-five years. In his confession, Mathenia stated that "I'd just like to see if I can get put somewhere for about ten or twenty years ..."

Finally, the district court did not err in limiting the scope of the evidentiary hearing. For the foregoing reasons, the district court's denial of Mathenia's petition for writ of habeas corpus is affirmed.

BEAM, Circuit Judge, concurring specially.

I concur in the opinion prepared by Judge Van Sickle. I write separately to respond to Judge Bright's dissent.

The dissent is both internally inconsistent and incorrect in its description of the nature and character of the videotaped confession. I also object to the assault upon the defense lawyer who, of course, has no means by which he may respond to the pummelling.

Perhaps, a portion of Mr. Justice Blackmun's recent dissent in *Sawyer v. Whitley,* — U.S. ——, ——, 112 S.Ct. 2514, 2528, 120 L.Ed.2d 269 (1992) puts the dissent in perspective. Noting his strong reservations about the death penalty, Justice Blackmun pointed out that in *Furman v. Georgia,* 408 U.S. 238, 411, 92 S.Ct. 2726, 2815, 33 L.Ed.2d 346 (1972) he said, "[w]e should not allow our personal preferences as to the wisdom of legislative and congressional action [on the death penalty], or our distaste for [the death penalty] to guide our judicial decision."

After colorful invective directed toward the nature of the videotaped confession, the dissent says, "I do not quarrel with the conviction [of Mathenia] for capital murders." Presumably this means that the videotape was admissible in the guilt/innocence phase of the trial, but not in the penalty portion of the proceeding. Why the tape would be acceptable for one facet of the trial but unduly prejudicial for another part is unexplained (and perhaps unexplainable). Apparently in a jurisdiction without capital punishment the evidence would have been satisfactory to the dissent but not in a state, such as Missouri, with a death penalty. Such a view, if held, is not based on the rules of evidence.

Now to the videotape. The dissent first claims that Mr. Mathenia "appeared in dirty prison garb." He was not, of course, in prison garb, he was a pretrial detainee lodged in the local jail. From statements in the tape itself, it is possible to determine that he was in his usual dress and it is not possible to judge cleanliness.

I do not disagree that Mathenia appeared unshaven and with long hair. But, rather than a "vacant disconnected" demeanor like a "mad-demon incarnate," he was composed, controlled, and spoke quietly and in great detail about the two murders which he had committed. Prior to commencement of the confession the sheriff went over the *Miranda* warnings in detail and discussed with Mathenia the fact that his lawyer had just advised him against "giving the tape." The officer noted that "he [Mathenia's lawyer] advised you not to give us this tape." Mathenia replied, "[t]hat is right." He was then asked "[y]ou siad you would rather go ahead?" Mathenia answered "[y]es." And as admitted in the dissent, Mr. Hager told Mathenia that he could "get the death penalty" if he gave the taped confession. With that, Mathenia then presented an articulate and meticulous statement of his actions.

Other evidence indicates that Mathenia overruled his lawyer because he apparently thought he could use the confession as a device to argue for a period of incarceration. The videotape establishes that such an attempt was made. His attorney should not be blamed for Mathenia's premeditated miscalculation.

The dissent also terms defense counsel as ineffective because he "might have met with partial success by moving to suppress the videotaped confession" at the trial. The dissent cites not a single case in which such an approach has been successful. Videotaped confessions are routinely admitted at trial as are similar items of evidence such as color videotapes and photographs of murder scenes and victims and related evidence far more graphic than this particular tape. Such proof is, of course, prejudicial to a defendant but it is probative evidence of the crime that a jury is entitled to see.

Finally, the dissent supports its view that counsel was ineffective in this case by pointing to other death penalty cases with which Mr. Hager has been associated. Judge Bright cites *Chambers v. Armontrout*, 907 F.2d 825, 828 (8th Cir.1990) and *State v. Jones*, 705 S.W.2d 19 (Mo.1986). *Chambers* was a split (six to five) en banc decision of this court that is certainly not evidence, in my view, of ineffective assistance of counsel. In *Jones* there is not a hint of ineffective assistance. The case involved a shocking and cruel murder proved through, among other things, a confession by Jones. There is absolutely no indication that Hager had any connection with Jones while the evidence was being gathered. To use *Jones* to criticize Hager for his actions in this case is unfair.

BRIGHT, Senior Circuit Judge, dissenting.

I dissent. For the reasons stated in this dissent, I would require the State of Missouri to grant Chuck Lee Mathenia a new hearing on the penalty phase of his capital murder conviction or reduce the death sentence to life imprisonment without parole. *See* Mo.Rev.Stat. § 565.020 (1986 & West Supp.1992).

## I. INCOMPETENCE OF COUNSEL

Mathenia is well on the road to execution by reason of the carelessness and incom-

petence of his appointed public defender at trial, Donald W. Hager. *See, e.g., Strickland v. Washington*, 466 U.S. 668, 687–98, 104 S.Ct. 2052, 2064–70, 80 L.Ed.2d 674 (1984). Most significantly, without investigation, without objection and without giving his client proper counsel and advice, Hager permitted the jury to view Mathenia's color videotaped confession. In this videotaped statement, Mathenia appeared in dirty prison garb. He was unkempt and unshaven, with long scraggly hair. Mathenia had a vacant disconnected stare and demeanor. He looked like a mad-demon incarnate, not unlike similar portrayals of pathological killers in horror movies.

In this dissenter's judgment, the viewing of the videotape by the jury guaranteed the death penalty for Mathenia, regardless of any possible mitigating circumstances. I do not quarrel with the conviction for capital murders. Nor would this judge seek reversal if the confession were in the form of an audiotape or written transcript from the video. Any defense lawyer in a capital murder case worth his or her salt and possessing a modicum of competence, however, would have taken steps to prevent a client from appearing in this sheriff's televised production. Having failed in that regard, a competent attorney would have fought to keep the televised statement from the jury, so that the charged defendant might avoid condemnation to a death sentence.

This opinion technically cannot reproduce the full scenario that was revealed to the viewer of the forty-five minute videotape. The excerpted black and white photo, which has been reproduced from the sheriff's movie and attached as an appendix to this opinion, gives a glimpse of the defendant as the jury viewed him. Mathenia was seen by the jury in the worst possible light while he confessed to his crimes. This prejudicial videotaped statement unfolded in the courtroom without benefit of intervention by the defendant's counsel, who did not come to his client's aid either prior to the capture of the statement on video, or thereafter, by making a motion to suppress the videotape in whole or in part.

Hager's failure to act is more egregious here than in ordinary criminal defense situations because he knew from medical reports that his client was mildly mentally retarded. App. G at 124, 127. Hager also knew that Mathenia had given a false confession to a rape charge less than one year before the statement at issue in this appeal. *Id.* at 130. Mathenia just wanted to please everyone. He certainly pleased the sheriff and the prosecutor in this case.

A. Incompetence in permitting sheriff to obtain videotaped confession without objection and without properly advising the client.

Hager was in court in Jackson, Missouri in Cape Giradeau when the Madison County Sheriff telephoned to indicate that Mathenia was about to confess. App. G at 124. Hager was approximately forty to sixty miles from where Mathenia was held in jail.[1] As already noted, counsel knew Mathenia was mentally retarded and had previously made a false confession to rape. Counsel knew that Mathenia had refused to talk to the authorities until an attorney was appointed to represent him. *Id.* at 132. Counsel was aware that Mathenia had remained silent during the approximate two week confinement that preceded the sheriff's phone call. *Id.* at 133. Yet, Hager never made any attempt to talk to his client personally, face-to-face, to determine why Mathenia changed his mind. *Id.* at 127–28. Hager never instructed the sheriff not to talk to his client until he or his investigator could come to the Madison County jail. *Id.* at 127–28, 130. He simply told his client that he could get the death penalty and then "told Chuck it was his decision." *Id.* at 127.

The lack of attorney diligence and competency is vividly captured in this colloquy between Hager and Mathenia's habeas

---

1. At oral argument, counsel for the State of Missouri estimated that the distance between Cape Giradeau, where Hager was in court, and the jail where Mathenia was being held was approximately 40 to 60 miles.

counsel at the federal district court habeas corpus hearing:

> Q. Knowing that Chuck had confessed to a rape that he did not commit, and knowing that he was at least borderline mentally retarded, and knowing that the doctor in his certification, I have trouble—Dr. Vicioso—in his certification, had found him to be at least borderline mentally retarded; knowing all of that, you did not make any attempt to talk to the sheriff when you received that phone call and say, "I don't want Chuck doing anything until I get there"?
>
> A. That's right.

*Id.* at 130.

Yet, Hager knew that the events transpiring at the jail could compromise his client's rights.

> Q. Do you recall someone telling you that there was a proposal that Chuck make a statement?
>
> A. Probably so but I don't have any good memory on that. I know that I understood that something must be going on at the jail that they considered to be very important; possibly they were about to get a confession. I was aware of the importance of what was happening and the nature of what it was.

*Id.* at 125.

Research reveals no cases that have addressed the issue of whether, in order to act as the effective counsel guaranteed by the sixth amendment, an attorney should instruct a sheriff to delay taking his or her client's confession until he or she can be at the jailhouse during the statement. Under *Strickland,* however, a court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690, 104 S.Ct. at 2066. Under the facts of this case as they were known to Hager at the time of the videotaped confession, his failure to delay the confession until he could be present with his mentally retarded client was unreasonable performance. *Id.* at 688, 104 S.Ct. at 2065. Hager's conduct clearly was inadequate.

**B. Failure to Move to Suppress Videotape**

Hager perpetuated his incompetence thereafter by failing to follow through with a motion to suppress the confession. Hager initially indicated, during a pre-trial conference on June 7, 1984, that he planned to file a motion to suppress the videotaped confession. App. C1 at 2. During the preliminary hearing in Madison County Circuit Court on July 19, 1984, however, Hager stated that he had not filed a motion to suppress the defendant's statement at the circuit court level "for the reason that I believe that it would have no chance of success." App. B2 at 1.

At the time of this critical decision, Hager knew that Mathenia confessed after two weeks of refusing to make a statement until he had been appointed counsel. App. G at 132–33. No lawyer could doubt that the videotaped statement amounted to self-incrimination for the murders by Mathenia who put himself in the worst possible light by his television appearance. Cast as the villain of that film, an Oscar was already his. Only that Oscar award amounted to a death sentence, unless somehow undone by the intervention of counsel. But counsel did nothing.

Hager's excuse was, in effect, that a suppression motion would do no good. App. B2 at 1; App. G at 131, 171. I will not dispute that the text of the confession, either in the form of an audio statement or a written transcript, possibly may have survived a motion to dismiss. My view is otherwise with respect to the video portion of the confession. Hager might have met with partial success by moving to suppress the videotaped confession.

In the first case in which this Circuit discussed a videotaped confession, this court affirmed, in a divided opinion, the admission of videotaped statement. *Hendricks v. Swenson,* 456 F.2d 503 (8th Cir. 1972). In *Hendricks,* however, the videotape related only to the guilt of a defendant in a first degree murder prosecution, not the likelihood of a death penalty. *Id.* at 504; *see also Gilmore v. Armontrout,* 861 F.2d 1061, 1072–73 (8th Cir.1988) (admis-

sion of defendant's videotaped confession to two unrelated murders at sentencing phase of capital murder trial violated no federal constitutional rights), *cert. denied*, 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1037 (1989). In addition, the Eleventh Circuit addressed the subject of a videotaped confession in *Gates v. Zant*, 863 F.2d 1492 (11th Cir.) (per curiam), *cert. denied*, 493 U.S. 945, 110 S.Ct. 353, 107 L.Ed.2d 340 (1989). In *Gates*, however, the court only considered whether showing the defendant in handcuffs during a videotaped statement was unduly prejudicial. *Id.* at 1501–02.

Neither *Hendricks, Gilmore* nor *Gates* considered whether the video portion of a confession should be redacted as violative of a defendant's basic rights against self-incrimination. That issue remains an open one. No real excuse exists for Hager's failure to seek to suppress the confession. Nor is there any legitimate professional reason for not having argued before the state trial judge, at the very least, that the video portion of the confession should not be submitted to the jury. As Judge Heaney observed, "[i]n terms of effect upon the jury, the playing of a defendant's video-taped confession at trial is the functional equivalent of requiring [the defendant] to take the stand and testify against himself." *Hendricks*, 456 F.2d at 509 (Heaney, J., dissenting).

## C. Other Evidence of Incompetence

In addition to Hager's deficient performance with respect to the admission of Mathenia's videotaped statement at trial, his investigation into the circumstances surrounding the confession was superficial at best. Hager only made a minimal effort to investigate whether Mathenia, with an approximate IQ of 70 and a mental age of ten or eleven, App. G at 17, knowingly and intelligently waived his *Miranda*[2] rights before trial. At the time of the phone call from Sheriff Asher, Hager claimed, Mathenia seemed to understand his rights under *Miranda*. App. G at 177–78.

Expert testimony at the evidentiary hearing suggests the opposite conclusion. According to Dr. Daniel J. Cuneo, Mathenia was incapable of knowingly and intelligently waiving his *Miranda* rights. *Id.* at 32–33. Mathenia was "extremely impulsive" and "want[ed] to please." *Id.* at 34. Sheriff Asher simply read Mathenia the standard seven line statement of the *Miranda* warnings, without checking to determine whether Mathenia actually understood each component of the warning. *Id.* at 33; *see also* App. B1 at 67. Mathenia appeared "completely oblivious to what they [we]re doing," Cuneo observed. *Id.* at 112. Under the circumstances, Cuneo concluded, Hager's brief telephone conversation with Mathenia failed to advise his mentally retarded client of the scope of the rights he was waiving. *Id.* at 34.

Hager's conduct at the guilt phase of the trial, moreover, does little to suggest confidence in the outcome of the proceedings. Hager called no witnesses at the guilt phase and rested without presenting a defense. *See* App. C at 297. He failed to object when Sheriff Asher testified that Mathenia said his attorney told him "he'd get the electric chair" if he made a statement. *Id.* at 274. Hager made no objection to the videotaped confession on the grounds that Mathenia had not knowingly or intelligently waived his *Miranda* rights.

## II. THE *STRICKLAND* STANDARD HAS BEEN MET

Under the standards for analyzing a claim of ineffective assistance of counsel enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), defendant-petitioner Mathenia must show that Hager's performance was deficient and that it prejudiced his defense. *Id.* at 687, 104 S.Ct. at 2064. "Counsel's performance is deficient when it is less competent than the assistance that should be provided by a reasonable attorney under the same circumstances." *Chambers v. Armontrout*, 907 F.2d 825, 828 (8th Cir.) (en banc) (citing *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064), *cert. denied*, — U.S. —, 111 S.Ct. 369, 112 L.Ed.2d 331 (1990).

---

**2.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

No further extended discussion should be necessary to arrive at the conclusion that Hager failed many times to provide the "professionally competent assistance" envisioned by *Strickland.* 466 U.S. at 690, 104 S.Ct. at 2066. First, by not taking action to assure that his mentally retarded client would not speak to the sheriff and incriminate himself, Hager virtually assured a death penalty. Second, after seeing his first failure, represented by the videotape, Hager performed deficiently by not attempting in any way to rectify his mistake. Counsel should have filed a motion to suppress and attempted, at a minimum, to prevent the jury from seeing the damning videotaped footage of the confession. Third, Hager acted ·unreasonably by not taking other steps to avoid the death penalty, including the presentation of reasonable evidence of Mathenia's mental retardation at the guilt phase.

Finally, the prejudice from Hager's incompetency stands without serious erosion in the record. Mathenia's appearance in the videotaped confession stereotyped him as a pathological killer. Without the prejudicial impact of the video, he would have come across as an aberrant mentally retarded murderer who might not deserve the death penalty. The jury, however, saw only one side of Mathenia, his demonic appearance in the videotape. The end result was far more prejudicial for Mathenia than if he had been compelled to stand trial in fully identifiable prison clothing, a practice which the Supreme Court has declared unconstitutional. *Estelle v. Williams,* 425 U.S. 501, 512, 96 S.Ct. 1691, 1697, 48 L.Ed.2d 126 (1976) (fourteenth amendment prohibits the state from compelling an accused "to stand trial before a jury while dressed in identifiable prison clothes").

## III. CONCLUSION

Students of the death penalty seem to observe that, quite often, no rhyme or reason differentiates between the killer who is put to death and the killer who receives life imprisonment. As Justice Marshall observed, "[t]he task of eliminating arbitrariness in the infliction of capital punishment is proving to be one which our criminal justice system—and perhaps any criminal justice system—is unable to perform." *Godfrey v. Georgia,* 446 U.S. 420, 440, 100 S.Ct. 1759, 1771, 64 L.Ed.2d 398 (1980) (Marshall, J., concurring) (footnote and citations omitted). This court and the Supreme Court, however, will not countenance the execution of a defendant who has not received the assistance of competent counsel. *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068; *Fretwell v. Lockhart,* 946 F.2d 571 (8th Cir.1991), cert. granted, —— U.S. ——, 112 S.Ct. 1935, 118 L.Ed.2d 542 (1992); *Kenley v. Armontrout,* 937 F.2d 1298 (8th Cir.), cert. denied, —— U.S. ——, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991); *Henderson v. Sargent,* 926 F.2d 706 (8th Cir.1991), cert. denied, —— U.S. ——, 112 S.Ct. 915, 116 L.Ed.2d 815 (1992); *Chambers,* 907 F.2d at 828–33.

Here, we know that Hager has provided ineffective assistance of counsel in at least one other Missouri death penalty case. *Chambers,* 907 F.2d at 828–33 (granting habeas relief of a new trial on the grounds of the ineffective assistance provided the defendant by Hager). During the same general period of time that he was representing Mathenia, Hager represented a second capital murder defendant, Marvin Jones. *See* App. G at 142–46. Jones, like Mathenia, received the death penalty. *See State v. Jones,* 705 S.W.2d 19 (Mo.), cert. denied, 477 U.S. 909, 106 S.Ct. 3286, 91 L.Ed.2d 574 (1986).

In Mathenia's case, as in *Chambers,* Hager's patently deficient performance prejudiced his client's defense. Accordingly, I would grant the writ in part and require either that Missouri resentence Mathenia to the maximum prison sentence under the law or retry the penalty phase against Mathenia.

I add a brief comment concerning Judge Beam's assertions in concurrence relating to the motives of this dissenter and Judge

Beam's defense of what I consider incompetent lawyering.

The picture of Mathenia in the appendix tells only part of the story, but enough for any disinterested observer to realize that a defense lawyer is not doing his job in a capital murder case when he permits, without objection, his defendant, via videotape, to appear before a jury looking like Mathenia looked. Moreover, Judge Beam presumes too much in suggesting that the video was admissible in one portion of the trial but not the other, according to my opinion. As the dissent made quite specific, p. 455, the defense lawyer should have fought to keep the "televised statement" from the jury. The unfair prejudice arose from the pictures and affected the punishment, not the guilt/innocence phase, inasmuch as the record as a whole otherwise established strongly that Mathenia had committed the murders.

Finally, contrary to Judge Beam's understanding of my obligation as a judge of this court, I do not write from any opposition to, or preference for, the death penalty. The State of Missouri may put Mathenia to death but only after a trial in which he is afforded a defense by a competent attorney; that judicial philosophy is in accord with the views of the United States Supreme Court and of the judges of this court. *See supra* p. 458.